UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARVIN GERBER AND KALMA KOENIG, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE FINANCIAL TRUST COMPANY, XYZ CORPORATION, ABC, INC., and JEFFREY E. EPSTEIN,<br><br>Defendants. | Case No.<br><br><br><br>**INITIAL COMPLAINT**<br><br><br><br>**ECF CASE** |

Marvin Gerber and Kalma Koenig (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, by their attorneys, Hach Rose Schirripa & Cheverie, LLP ("HRSC"), bring this Complaint against the Defendants, The Financial Trust Company ("TFTC"), Jeffrey E. Epstein ("Epstein"),[1] XYZ Corp., and ABC, Inc., as follows:

## INTRODUCTION

1.     This is an action to recover damages on behalf of Plaintiffs and members of the proposed class, defined below (the "Class"), who are Noteholders and Bondholders of Towers Financial Corporation ("TFC") for harm suffered as a result of Defendants' conspiring and participation in a massive Ponzi scheme perpetrated by Defendant Jeffrey Epstein, an uncharged co-conspirator of Steven Hoffenberg ("Hoffenberg"). Epstein used The Financial Trust Company, XYZ Corp., and ABC, Inc. to conceal his ill-gotten gains, obtained from his participation in a

---

[1] Defendant Epstein is sued herein in his individual capacity as well as in his capacity as President and Chief Executive Officer of The Financial Trust Company.

fraudulent Ponzi scheme, from banks, financial institutions, and current investors.

2.      While Hoffenberg was convicted as a result of his role in this Ponzi scheme, Epstein has remained an uncharged co-conspirator.[2]  All the while, Epstein knowingly and intentionally utilized funds he fraudulently diverted and obtained from this massive Ponzi scheme for his own personal use to support a lavish lifestyle. All of Epstein's acts and omissions, as alleged herein, were in contravention to duties owed to TFC, Plaintiffs and the Class and in violation of the law.

3.      Defendants have acquired consistent and unlawful profits at the expense of Plaintiffs and the Class by creating and operating a fraudulent Ponzi scheme, as described herein, and without disclosing their fraudulent activities.  Noteholders and Bondholders, such as Plaintiffs and the Class, have remained unaware of these deceptive practices until the recent affidavit of Non-Party Affiant Hoffenberg.[3]

4.      On information and belief, Defendants' deceptive practices date back to the mid-1980s, affect similarly-situated customers throughout the nation, and may have yielded hundreds of millions of dollars in unlawful profits to Defendants.  Defendants' activities were the subject of a criminal investigation which led to the conviction of Non-Party Affiant Hoffenberg in the late 1990s and several related civil lawsuits within this judicial District.

5.      Plaintiffs and other Class members could not reasonably have detected Defendants' deceptive, unlawful and unfair practices.  While Plaintiffs and the Class realized the depth and breadth of the Ponzi scheme following Hoffenberg's conviction and the several related civil lawsuits, Defendants' involvement was purposefully concealed and not revealed until Hoffenberg's

---

[2] In *United States of America v. Steven Hoffenberg*, 94 Cr. 213 (RWS), 95 Cr. 321 (RWS), 1997 U.S. Dist. LEXIS 2394 (S.D.N.Y. Mar. 4, 1997), Judge Robert Sweet issued a Sentencing Opinion ("Sentencing Opinion") which lays bare the fraudulent conduct that resulted in Hoffenberg's conviction and which was imputed to Hoffenberg's co-conspirators. *See* Exhibit A.

[3] *See* Exhibit B which is an affidavit from Hoffenberg detailing Defendants' deceptive practices.

recent affidavit.

6.      Plaintiffs bring this action as a class action on behalf of all similarly affected Noteholders and Bondholders of TFC to recover the hundreds of millions of dollars in investments misappropriated for improper and personal uses.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this case pursuant to 28 U.S.C. §1331. In addition, the sum or value of the claims in this case, exclusive of interest and costs, exceeds $5,000,000 and Plaintiffs and other Class members are citizens of a state different than the Defendants. Therefore, this Court has jurisdiction over the remaining causes of action pursuant to 28 U.S.C. §1332(d).

8.      At all relevant times, the claims arose in this District. Defendants conducted and continue to conduct business based in this District.   As such, the unlawful and fraudulent conduct alleged herein originated in and arose out of this District. Furthermore, Defendants reside and/or maintain a principal place of business in this District.  Venue in the Southern District of New York is therefore proper pursuant to 28 U.S.C. §1391(a).

## PARTIES

9.      Plaintiff Marvin Gerber ("Gerber") is a resident of Wantagh, New York.  Plaintiff Gerber was an investor and/or noteholder in TFC, a dissolved Nevada corporation which had its principal place of business in New York, New York.

10.     Plaintiff Kalma Koenig ("Koenig") is a resident of San Mateo, California.  Plaintiff Koenig was an investor and/or noteholder in TFC, a dissolved Nevada corporation which had its principal place of business in New York, New York.

11.     Defendant Jeffrey Epstein is an uncharged co-conspirator in connection with the fraudulent Ponzi schemes described herein.  Defendant Epstein resides at 9 East 71st Street, New

York, New York 10021.

12.     Defendant The Financial Trust Company ("TFTC") is a hedge fund formed under the laws of St. Thomas in the U.S. Virgin Islands in 1996. Defendant TFTC was created, incorporated, owned, and managed, directly or indirectly, by Epstein, or entities controlled by Epstein. Upon information and belief, TFTC was created by and/or received monies, securities or proceeds which were obtained and/or raised pursuant to the fraudulent conduct described herein and without disclosure of the fraudulent nature. Defendant TFTC has misappropriated or converted such monies, securities and proceeds.

13.     Defendants XYZ Corp. ("XYZ") and ABC, Inc. ("ABC") are fictitious names. Plaintiffs reserve the right to amend this Complaint as a result of pleading fictitious parties. Defendants XYZ and ABC are believed to be specific companies engaged in the businesses of financial services and real estate, or subsidiaries thereof, including, but not limited to, holding companies, trust companies and hedge funds, which have been created, owned, or managed, directly or indirectly, by Epstein, or entities controlled by Epstein, during the period beginning from his relationship with TFC to the present.  Upon information and belief, such entities were created by and/or received monies, securities or proceeds which were obtained and/or raised pursuant to the fraudulent conduct described herein and without disclosure of their fraudulent nature. Defendants XYZ and ABC are entities which have misappropriated or converted such monies, securities and proceeds but are not, as of yet, known by Plaintiffs at the time of the filing of this Complaint.

14.     Defendants XYZ Corp., ABC, Inc., and The Financial Trust Company, shall hereinafter be collectively referred to as the "Defendant Entities."

15.     Non-Party Affiant Steven Hoffenberg ("Hoffenberg") was the Chief Executive Officer of TFC from 1975 through April 1993 and was a co-conspirator of Defendant Epstein in

the massive Ponzi scheme described herein.

16.    On March 4, 1997, Hoffenberg was convicted by Judge Sweet of the Southern District of New York for his role in a massive fraud conducted through TFC and associated entities and perpetrated by him and his, until now, unnamed co-conspirators (the "TFC Ponzi Scheme"). *See United States of America v. Steven Hoffenberg*, 94 Cr. 213 (RWS), 95 Cr. 321 (RWS), 1997 U.S. Dist. LEXIS 2394 (S.D.N.Y. Mar. 4, 1997).  Hoffenberg was convicted of conspiracy to violate securities laws by fraudulently selling securities in violation of 18 U.S.C. § 371, mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1342, conspiracy to obstruct justice in violation of 18 U.S.C. § 371, and tax evasion in violation of 26 U.S.C. § 7201.[4]

17.    The TFC Ponzi Scheme was implemented through a host of illegal and fraudulent conduct which resulted in hundreds of million dollars in losses to over 200,000 investors who, directly or indirectly, purchased securities sold by TFC in the late 1980s through the mid-1990s. From the late 1980s and through the mid-1990s, the Noteholders and Bondholders of TFC (i.e., Plaintiffs and the Class) invested in these securities based on false memoranda, financial statements and supporting documents which promised profitable investments and high returns.

18.    Defendant Epstein and the Defendant Entities fraudulently obtained investor funds by playing key roles in the fraudulent schemes described herein, without disclosing the true nature of their activities, such that the Defendants were unjustly enriched, and therefore, may not in good conscience retain the continued beneficial interests of their ill-gotten gains.

## STATEMENT OF FACTS

---

[4] Hoffenberg was sentenced to (i) twenty (20) years of imprisonment, followed by three (3) years of supervised release, (ii) a fine of one million ($1,000,000) dollars, and (iii) restitution owed in the amount of $475,157,340 plus interest, which, with over 20 years of accrued interest, now totals approximately one billion ($1,000,000,000) dollars, which represents the losses as determined by the Bankruptcy Court of the victims of his Ponzi scheme.

19. From 1975 through April 1993, Hoffenberg served as Chief Executive Officer of TFC, a corporation which provided a wide array of financial services and assistance to its clients. Specifically, TFC was in the business of purchasing large volumes of outstanding receivables, and then collecting on them.

20. TFC also owned and operated subsidiaries including Towers Credit Corporation, which purchased and purportedly collected on commercial accounts receivables; Towers Collection Services, Inc., which collected past-due accounts receivable for third parties on a contingency basis; and Towers Healthcare Receivables Funding Corporations I, II, III, IV and V (collectively the "THRFC Bond Funds"), which issued hundreds of millions of dollars in bonds and engaged in factoring healthcare receivables.

21. Hoffenberg and Epstein joined forces in the mid-1980s. Prior to that, Epstein had been running International Assets Group Inc., a consulting company, out of his apartment in New York City.

22. In or around 1987, Hoffenberg and TFC hired Epstein as an associate and expert consultant. This "consulting" engagement entailed Epstein assisting Hoffenberg full-time in all matters of business operations and management of TFC, as well as working with Hoffenberg to raise capital for TFC from investors.

23. Defendant Epstein, through entities including TFC and the Defendant Entities, raised over five hundred million dollars ($500,000,000) from investors in the course of carrying out the TFC Ponzi Scheme.

24. The Ponzi scheme perpetrated by Hoffenberg and Epstein through TFC was an intricate fraud which depended on Epstein and Hoffenberg's maintaining capital inflow to cover off losses incurred by existing investors.

25.     For example, in 1987, TFC acquired a controlling interest in United Diversified Corporation ("UDC"), which conducted business through two Illinois insurance company subsidiaries, Associated Life Insurance Co. ("Associated") and United Fired Insurance Co. ("United Fire").

26.     Epstein was the architect of the plan to secure the approval from Illinois state regulators for TFC's acquisition of the insurance companies. Indeed, approval was obtained because Epstein represented to regulators that TFC would contribute three million dollars ($3,000,000) to the surplus of United Fire – two million dollars ($2,000,000) immediately and an additional one million dollars ($1,000,000) at a later date.

27.     Thereafter, in or around November 1987, Hoffenberg and Epstein used Associated and United bonds as collateral in securities brokerage accounts, controlled by Epstein, in a failed take-over attempt of Pan American Airways, Inc. ("Pan Am"). When the take-over failed, largely due to the bombing of Pan Am Flight 103 over Lockerbie, Scotland, United Fire and Associated suffered devastating trading losses, resulting in attendant losses for investors in TFC.

28.     Epstein and Hoffenberg diverted investor funds to hide those catastrophic losses, while at the same time lining their own pockets with millions of dollars of investment capital to keep up with their lavish lifestyles.

29.     Notably, between November 1987 and July 1988, checks were issued by TFC from UDC and United Fire's accounts for a number of improper expenditures, including the payment of investment consultant fees for TFC consultants, including Epstein.

30.     Between December 1987 and June 1998, Hoffenberg and Epstein again used Associated and United Fire bonds as collateral in securities brokerage accounts, controlled by Epstein, to purchase and sell stock and options in a number of high risk investments, including one

in Emery Air Freight ("Emery").  Similar to the situation with Pan Am, TFC's attempted take-over of Emery was a dismal failure, resulting in massive trading losses to TFC.

31.     In the wake of these losses to TFC, Epstein manipulated the price of Emery stock to minimize the losses when the share price began to fall. In order to do so, Epstein opened and maintained a number of brokerage accounts to execute false trades in order to artificially inflate the price of Emery stock – while the company was in reality useless.  Because Epstein did not have a license to trade, Epstein traded, purchased and sold stocks, bonds and other securities by what he referred to as "making the orders" through licensed brokers.

32.     As the puppet master of Emery stock fraud, Epstein was making sizeable profits off his trading on insider information.  According to Hoffenberg's sworn affidavit, annexed hereto, Epstein misappropriated the proceeds for not only his personal use, but also to start his own company, Defendant TFTC.

33.     United Fire and Associated lost over one million dollars ($1,000,000) on the purchase of Emery securities, due to the fact that the stock was purchased with funds borrowed by using insurance company bonds as collateral.

34.     Defendant Epstein and Hoffenberg concealed their unsavory activities through many deceptive actions, including but not limited to, routing all securities trades confirmations from brokerage firms to TFC, rather than to the insurance companies' offices; causing false entries to be made on the records of the insurance companies; failing to provide supporting documentation for expenditures; providing false information or withholding accurate information in annual and quarterly reports regarding the location and use of bonds; capital contributions made to the insurance companies; creating false documents; and closing out securities positions without regard to the profitability of the transactions.

35.     By the late 1980s, TFC became insolvent as a result of the massive losses it had incurred over the years.  According to Hoffenberg, Epstein then devised a new fraudulent scheme to raise capital for TFC – namely, by selling Promissory Notes.

36.     From January 1988 through March 1992, TFC sold the Promissory Notes in private placements by means of six (6) separate private placement offering memoranda (the "TFC Promissory Notes"). Defendant Epstein and TFC, represented to investors that the TFC Promissory Notes were collateralized by accounts receivable owned by TFC.

37.     The six private placement offerings resulted in the sale of approximately two hundred seventy two million dollars ($272,000,000) in TFC Promissory Notes throughout the United States.

38.     Epstein fraudulently induced investors to purchase the TFC Promissory Notes by assisting in the preparation and the distribution of financial statements which used falsified income and asset figures to deceitfully conceal TFC's true financial condition. The falsified income and asset figures were a key component of continuing Defendant Epstein's Ponzi scheme.  Since TFC had taken such heavy losses on a series of failed investments, the company was deep in the red.  In order to sell investors on the idea of future profits from investment in the TFC Promissory Notes, it was necessary to show investors that TFC was profitable.

39.     As set forth in the accompanying Affidavit of Hoffenberg, annexed hereto, Epstein participated, directly and indirectly, in arranging to have a certified public accountant falsely verify that the financial statements reflected TFC's financial condition.

40.     Ultimately, only a small fraction of the proceeds from the sale of the TFC Promissory Notes were used for the purpose stated in the offering documents. The proceeds from the sales of the TFC Promissory Notes were used to pay TFC's operating expenses, including

personal expenses of the conspirators, and to pay interest on the TFC Promissory Notes which were not properly collateralized.

41.     Defendant Epstein, directly and indirectly, represented to investors that the face value of the collateral exceeded the face value of the TFC Promissory Notes. Instead, the collateral was a fiction backed by falsified receivables which did not exist.

42.     In or about July 1990, Epstein, through TFC and in furtherance of the Ponzi scheme, made additional efforts to raise capital and expand TFC by offering and selling additional debt instruments in the form of bonds to investors ("TFC Bonds").

43.     Moreover, Defendant Epstein, directly and indirectly, created, or caused to have created, TFC subsidiaries, the THRFC Bond Funds, which were a series of corporate entities that issued the TFC Bonds.  The TFC Bonds were sold pursuant to five (5) separate private placement memoranda which indicated that the proceeds from the sales of the TFC Bonds would be used by the THRFC Bond Funds, in whole or in part, to purchase healthcare receivables from TFC and that the healthcare receivables purchased from TFC would collateralize the TFC Bonds.

44.     Defendant Epstein and Hoffenberg deliberately misrepresented how investor funds would be used and subsequently misused the proceeds from the sale of the TFC Bonds.

45.     In preparation for acquiring healthcare receivables, TFC would provide a total figure for the amount of receivables it planned to acquire; in response, a percentage of the value of the receivables was released to TFC in cash.  This cash was supposed to be used to make the first payment on the receivables. When more money was needed to operate TFC, Hoffenberg and Epstein provided inflated figures for the receivables to accommodate TFC's cash needs. Thus, 50% of the value of falsified receivables was released to TFC who used the cash to pay TFC's operating expenses.

46.      Despite the intended and stated purpose in the offering documents, Epstein diverted the funds and funneled a substantial amount of the proceeds of the sale of the TFC Bonds to pay TFC's operating expenses.

47.      To cover up the fraud, Defendant Epstein directed collateral to be moved from one THRFC Bond Fund to another and falsified collateral records in the periodic reports to investors and SEC filings. Further, Epstein and Hoffenberg created phony receivables, then included those items in reports designed to misrepresent the true financial picture of the THRFC Bond Funds. Despite Defendant Epstein's central role in this now widespread, massive Ponzi scheme, his actions were taken on behalf of TFC – Hoffenberg's company for which Epstein only "consulted".

48.      Between July 1990 and May 1992, TFC sold approximately two hundred ten million ($210,000,000) dollars in TFC Bonds. Like the TFC Promissory Notes, the financial statements provided to potential investors used falsified income and asset figures to conceal TFC's true financial condition.

49.      In February 1993, following a lengthy investigation, the Securities and Exchange Commission ("SEC") filed suit against Hoffenberg, TFC, and other TFC officials for, among other things, securities fraud through the circulation of false and misleading financial statements to investors regarding TFC's financial condition.

50.      In or around March 1993, TFC filed for Chapter 11 bankruptcy protection, and the Noteholders and Bondholders filed claims with the Bankruptcy Court to support their loss claims.[5]

51.      On April 19, 1994, and as a result of the SEC investigation, Hoffenberg was indicted in the Northern District of Illinois on various fraud charges.

---

[5] *See In re Towers Financial Corporation*, *et. al*. Case No. 93-B41558 (PBA) (S.D.NY. Dec. 8, 1994).

52.     The very next day, on April 20, 1994, Hoffenberg was indicted in the Southern District of New York on numerous charges resulting from the SEC investigation and lawsuit, including mail fraud, securities fraud in connection with the sale of the TFC Promissory Notes and TFC Bonds, unlawful conspiracy and obstruction of justice. The indictment pending in the Northern District of Illinois was transferred to the Southern District of New York in April 1995.

53.     In the course of the trial, Prosecutors in this District offered Hoffenberg a reduced sentence in exchange for information about his co-conspirators in the TFC Ponzi Scheme – namely Defendant Epstein's role. However, Hoffenberg did not disclose any details about Defendant Epstein's involvement, let alone orchestration, of the fraudulent scheme.  It was only in May 2016 that Hoffenberg provided the first insight to the public and authorities regarding Defendant Epstein's role.[6]

54.     As a result of Hoffenberg's refusal to implicate Defendant Epstein, Epstein was never indicted for his role in the TFC Ponzi Scheme. Epstein was never charged with any crime in connection with the TFC Ponzi Scheme.  Rather, Epstein has been permitted to use the ill-gotten gains and misappropriated investor funds from his role in the TFC Ponzi Scheme to start and grow Defendant TFTC.

55.     On April 20, 1995, Hoffenberg pled guilty to conspiracy to violate the securities laws by fraudulently selling securities, in violation of 18 U.S.C. § 371; mail fraud, in violation of 18 U.S.C. § 1341; conspiracy to obstruct justice, in violation of 18 U.S.C. § 371; and tax evasion, in violation of 26 U.S.C. § 7201. Hoffenberg also pled guilty to one count of the indictment transferred from the Northern District of Illinois.

---

[6] In May 2016, Hoffenberg through his attorneys, filed a Complaint in this District, docket number 1:16-cv-03989, alleging similar causes of action against Epstein and the Defendant Entities, seeking relief on behalf of himself and as a constructive trustee of the Noteholders and Bondholders of TFC.

56.     In or around April 1996, the Bankruptcy Court determined that the claims of the TFC Noteholders and Bondholders, in the total amount of $475,157,340, were valid and actionable.

57.     On March 7, 1997, for his role in the TFC Ponzi Scheme, Hoffenberg was sentenced to twenty years' in prison, a term of supervised release, as well as a one million dollar ($1,000,000) fine, approximately four hundred seventy-five million dollars ($475,000,000) in restitution, and court surcharges.

58.     The Sentencing Opinion sets forth fraudulent wrongful acts which were committed by Hoffenberg "*and his co-conspirators.*" **The Affidavit of Hoffenberg, annexed hereto, makes abundantly clear that Defendant Epstein and the Defendant Entities were Hoffenberg's co-conspirators.**

59.     As per the Sentencing Opinion, Hoffenberg **and his co-conspirators** (i) used certain of the Associated and United's bonds as collateral in securities brokerage accounts in order to purchase stock of Pan Am and Emery; (ii) created false documents and filed false pleadings in related legal proceedings brought by state insurance regulators, closed out securities positions without regard to the profitability of the transactions, committed and suborned perjury, and concealed their fraudulent activities in connection with state insurance regulators' investigations; (iii) devised plans to sell Bonds and Promissory Notes and fraudulently induced the purchase of such Bonds and Promissory Notes in connection with the TFC Ponzi Scheme; (iv) in addition to creating fraudulent financial statements, arranged to have a certified public accountant falsely certify that the financial statements accurately reflected TFC's financial condition; (v) although the Promissory Notes were not properly collateralized, represented to investors that the face value of the collateral exceeded the face value of the Promissory Notes; (vi) deliberately misrepresented how investor funds would be used, and misused the proceeds from the sale of the Bonds; (vii) used

substantial amounts of the proceeds from the sales of the securities to meet TFC's operating expenses; (viii) created phony receivables to misrepresent the true financial ability to repay Bonds; and (ix) agreed from the outset of the SEC's investigation to take whatever steps they deemed necessary to obstruct that investigation and conceal their criminal activities.

60.     Beginning in the early 1990's, approximately one hundred (100) lawsuits, including, but not limited to, the cases listed below, were filed in the District Court of the Southern District of New York against Hoffenberg and TFC in connection with the TFC Ponzi Scheme:

| | | | |
|---|---|---|---|
| 1:89-cv-0 1689-RO | Foti v. Towers Financial Corp. | filed 03/13/89 | closed 01/04/90 |
| 1:92-cv-08998-SS | United Air Fleet v. Hoffenberg, et al | filed 12/14/92 | closed 11/16/93 |
| 1:93-cv-00810-WK-AJP | Gold, et a! v. Towers Financial, et al | filed 02/10/93 | closed 01/05/00 |
| I:93-cv-00855-WK-KAR | Field v. Twrs Financial Corp., etl | filed 02/11/93 | closed 10/31/95 |
| 1:93-cv-00987-WK | Ziegler v. Twrs Financial Corp., et al | filed 02/19/93 | closed 01/05/00 |
| 1:93-cv-0 1045-WK | Izzo v. Towers Financial, et al | filed 02/23/93 | closed 01/05/00 |
| 1:93-cv-01047-WK | Batten, et a1 v. Towers Financial, et al | filed 02/23/93 | closed 01/05/00 |
| 1:93-cv-01094-WK | Casey, et al v. Twrs Financial Corp., et al | filed 02/25/93 | closed 01/05/00 |
| 1:93-cv-0 1095-WK | Leibman, et a! v. Towers Financial, et al | filed 02/25/93 | closed 01/05/00 |
| 1:93-cv-01155-WK | Penner v. Towers Financial, et al | filed 03/01193 | closed 01/05/00 |
| 1:93-cv-0 1303-WK | Thorn, et al v. Twrs Financial Corp., et al | filed 03/04/93 | closed 01/05/00 |
| 1:93-cv-01543-WK | Siudmak, et al v. Towers Financial, et al | filed 03/12/93 | closed 01/05/00 |
| 1:93-cv-01686-WK-KAR | Bank Of Cape Verde v. TFC Funding Corp., eta | filed 03/17/93 | closed 03/10/97 |
| 1:93-cv-04449-WK | Dinsmore v. Towers Financial, et al | filed 06/30/93 | closed 08/19/98 |
| 1:94-cv-00619-WK-KAR | Davis v. Hoffenberg, et al | filed 02/01/94 | closed 08/02/00 |
| 1:94-cv-00724-WK | Rothman v. Hoffenberg | filed 02/04/94 | closed 08/02/00 |
| 1:94-cv-00725-WK | General Retirement, et al v. Hoffenberg, et al | filed 02/04/94 | closed 04/30/98 |
| 1:94-cv-00814-WK | Izzo, et al v. Hoffenberg, et al | filed 02/08/94 | closed 08/02/00 |
| 1:94-cv-02727-WK | Amer. Int'l. Lines, et al v. Towers Financial, et al | filed 04/14/94 | closed 11/30/98 |
| 1:94-cv-09344-WK-AJP | Sheridan, et al v. Hoffenberg, et al | filed 12/29/94 | closed 06/26/96 |
| 1:96-cv-04656-MGC | Cohen, v. Hoffenberg, et al | filed 06/21/96 | closed 06/28/96 |
| 1:96-cv-05125-PKL | Cohen, et al v. Hoffenberg, et al | filed 07/08/96 | closed 07/15/96 |
| 1:93-cv-01080-WK-KAR | Shawmut Bank v. Towers Financial, et al | filed 02/25/93 | closed 03/18/98 |
| 1:94-cv-0 1792-WK | Shawmut Bank Conn. v. Hoffenberg, et al | filed 03/15/94 | closed 08/02/00 |
| 1:90-cv-00056-LBS | Sahlen & Assoc. v. Towers Financial Cor | filed 01/04/90 | closed 12/10/90 |
| 1:88-cv-09178-RWS | Associated Dry Goods v. Towers Financial | filed 12/28/88 | closed 03/06/91 |
| 1:93-cv-00992-WK | Riviera v. Towers Financial, et al | filed 02119/93 | closed 01/05/00 |
| 1:93-cv-0 1543-WK | Siudmak, et al v. Towers Financial, et al | filed 03/12/93 | closed 01/05/00 |
| 1:93-cv-04449-WK | Dinsmore v. Towers Financial, et al | filed 06/30/93 | closed 08/19/98 |
| 1:91-cv-05231-LJF | Superstock, Inc. v. Towers Fin. Corp., et al | filed 08/01/91 | closed 04/28/92 |
| 1:93-cv-00961-WK | Murphy, et al v. Twrs Financial Corp., et al | filed 02/18/93 | closed 03/24/97 |
| 1:93-cv-0 1927-WK | Von Stange v. Twrs Financial Corp., et al | filed 03/24/93 | closed 02/21/97 |

61.     Pursuant to *Hoffenberg* and the Sentencing Opinion, the victims of the TFC Ponzi Scheme include over 200,000 individuals, who are directly or indirectly the Noteholders and Bondholders of TFC, and are entitled to $475,157,340, plus interest, which now totals approximately one billion dollars ($1,000,000,000).

14

62.     The full extent of Defendant Epstein's involvement in the TFC Ponzi Scheme and related frauds, which harmed Plaintiffs and the Class, could not have been discovered prior to Hoffenberg's execution of the Affidavit annexed hereto. Hoffenberg's Affidavit, dated August 17, 2018, sets forth for the first time, under the penalty of perjury, Defendant Epstein's full involvement in the TFC Ponzi Scheme.[7]

63.     While Plaintiffs and the Class were aware of the illegal activities which caused them and many others to lose hundreds of millions of dollars, Plaintiffs and the Class only knew that Hoffenberg had "co-conspirators" who remained unnamed, uncharged, and unindicted.

64.     Defendant Epstein continues to control the Defendant Entities which wrongfully received money fraudulently acquired from the Noteholders and Bondholders through the TFC Ponzi Scheme and the profits earned from monies misappropriated by Epstein and transferred as capital to the Defendant Entities including, but not limited to, Defendant TFTC.

65.     Defendant Epstein, individually, and by and through the Defendant Entities, continuously engaged in the fraudulent activities by concealing his fraudulent Ponzi schemes from banks, financial institutions and current investors of his margin account syndication.

66.     Defendant Epstein continues to deny his involvement in the TFC Ponzi Scheme and continues to wrongfully possess the funds to which Plaintiffs and the Class are entitled as victims of the TFC Ponzi Scheme.

## CLASS ACTION ALLEGATIONS

67.     This action is brought and may properly be maintained as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. This action is brought pursuant

---

[7] Hoffenberg's 2016 Complaint contained no statements sworn under penalties of perjury and was ultimately withdrawn with prejudice by then-Plaintiff Hoffenberg.  *See Steven J. Hoffenberg v. Jeffrey E, Epstein, et. al.*, Case No. 16-03989 (RJS) (S.D.N.Y May 27, 2016).

to 23(b)(3) of the Federal Rules of Civil Procedure for money damages.

68.     This suit is a class action brought on behalf of a Class consisting of and defined as all investors, Noteholders, and/or Bondholders of TFC who, directly or indirectly, purchased the TFC Bonds and TFC Promissory Notes sold by TFC between 1987 and 1993.

69.     Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, and the officers, directors, legal representatives, heirs, successors, subsidiaries and/or assigns of any such individual or entity.

70.     The members of the Class are so numerous that joinder of all members individually, in one action or otherwise, is impracticable. Plaintiffs believe that there are hundreds (if not thousands) of proposed Class members.

71.     There are numerous questions of law and fact common to Plaintiffs and the Class, including:

> A.  whether Defendants, with intent to derive the use, enjoyment and profits rightfully belonging to the Plaintiffs and the Class, created a Ponzi scheme and concealed their actual intentions of converting the assets of Plaintiffs and the Class for their own personal use, upon which Plaintiffs and the Class reasonably relied to their detriment;
>
> B.  whether Plaintiffs and the Class suffered monetary damages as a result of the Defendants' deceptive, unlawful and unfair actions and, if so, the proper measure of those damages; and
>
> C.  whether the Defendants owed certain duties to TFC, the Plaintiffs and the Class, including, but not limited to, the duty to exercise the highest degree of honesty, care, good faith and loyalty in handling the securities of TFC.

72.     Plaintiffs' claims are typical of the claims of the members of the Class, and it is a member of the Class described herein.

73.     Plaintiffs are willing and prepared to serve the proposed Class in a representative capacity with all of the obligations and duties material thereto.  Plaintiffs will fairly and adequately protect the interests of the Class and has no interests adverse to, or which conflict with, the interests of other members of the Class.

74.     Plaintiffs' interests are co-extensive with and not antagonistic to those of the absent Class members.  Plaintiffs will undertake to represent and protect the interests of absent Class members.

75.     Plaintiffs have engaged the services of the undersigned counsel. Counsel is experienced in complex class action litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiffs and absent Class members.

76.     The questions of law and fact common to the Class, as summarized above, predominate over any questions affecting only individual members, in satisfaction of Rule 23(b)(3), and each such common question warrants class certification under Rule 23(c)(4).

77.     A class action is superior to other available methods for the adjudication of this controversy.  Individualized litigation increases the delay and expense to all parties and the court system given the complex legal and factual issues of the case, and judicial determination of the common legal and factual issues essential to this case would be far more fair, efficient, and economical as a class action maintained in this forum than in piecemeal individual determinations.

78.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  Compared to individualized actions, the class action device presents far fewer management difficulties, and provides the benefits of

single adjudication, economy of scale, and comprehensive supervision by a single court.

79.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class.

## TOLLING THE STATUTE OF LIMITATION

80.     The applicable statute of limitation for each of the claims for relief asserted herein have been tolled by Defendants' acts of fraud, concealment, and intentional misrepresentation as described herein. Plaintiffs reasonably relied on the prior government investigations, which resulted in the conviction of Defendants' co-conspirator, and could not have discovered, even after exercising reasonable diligence, any of the claims for relief pleaded herein against Defendants prior to the affidavit of Non-Party Hoffenberg, executed on August 17, 2018.  Plaintiffs, in fact, did not discover any of the claims for relief pleaded herein until after such time.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION
### (Fraud)

81.      Plaintiffs repeat, reiterate and re-allege each and every allegation contained in all preceding paragraphs with the same force and effect as if more fully set forth herein.

82.     With the intent to derive the use, enjoyment and profits from TFC, Plaintiffs and the Class, and with the intent to injure such individuals, Epstein actively participated in devising the TFC Ponzi Scheme and he participated in acquiring assets and funds from such entities and individuals though TFC for his own personal gain or use, or the gain or use of the Defendant Entities.

83.     Under the guise of acting on behalf of TFC, Plaintiffs and the Class, Epstein actively participated in creating and executing several fraudulent Ponzi schemes.

84.     Epstein concealed his actual intentions of converting the assets of TFC, Plaintiffs

18

and the Class, to himself or the Defendant Entities for his own personal gain or use.

85.    Epstein utilized securities and cash, which properly belonged to TFC, Plaintiffs and the Class, and for which his co-conspirator Hoffenberg is court ordered to pay restitution, for the benefit of himself and/or the Defendant Entities.

86.    Epstein utilized these funds in contravention of their intended, disclosed purpose, and Epstein, ignoring the intended, disclosed purpose, transferred the funds to himself and/or to the Defendant Entities, for his own personal gain or use.

87.    TFC reasonably relied upon the Ponzi scheme, which was created and executed by Epstein, and that such scheme was in the best interests of TFC.

88.    Plaintiffs and the Class reasonably relied upon the fraudulent Ponzi scheme, which was created and executed by Epstein, and that such scheme was in the best interests of Plaintiffs and the Class.

89.    In an effort to continue to conceal this fraud from Plaintiffs and the Class, Epstein continues to hide and refuses to identify the assets and funds which were improperly transferred to Epstein and/or the Defendant Entities.

90.    In an effort to conceal the fraud from banks, financial institutions and current investors of his holdings and syndication of margin accounts, Epstein continues to hide and refuses to identify the assets and funds which were improperly transferred to Epstein and/or the Defendant Entities.

91.    As a direct and proximate result of the foregoing fraudulent acts, Plaintiffs and the Class have been damaged.

92.    The Defendants at all times acted with malice.

93.    The fraudulent actions of the Defendants merit the imposition of punitive damages.

19

## SECOND CAUSE OF ACTION
### (Conversion)

94.     Plaintiffs repeat, reiterate and re-allege each and every allegation contained in all preceding paragraphs with the same force and effect as if more fully set forth herein.

95.     From approximately 1987 through 1993, Epstein as a "consultant" to TFC, caused the transfer of securities, cash and assets from TFC to himself and/or to the Defendant Entities.

96.     Through these transfers and his intentional diversion of cash and assets, Epstein, by and through the Defendant Entities, purposefully interfered with the rights of TFC, Plaintiffs and the Class deprived Plaintiffs and the Class of use and benefit of the cash and interest earned on the securities.

97.     Instead Epstein, by and through the Defendant Entities dishonestly usurped the benefit and/or use of the cash and interest earned on the securities for himself and/or for the Defendant Entities.

98.     As a result, because of use of the fraudulent means described herein, Epstein and/or the Defendant Entities have continued to enjoy, use, and benefit from funds diverted from TFC, Plaintiffs and the Class.

99.     As a direct and proximate result of these improper acts by Epstein and/or the Defendant Entities, Plaintiffs and the Class have been damaged in an aggregate amount in excess of $500,000,000.

## THIRD CAUSE OF ACTION
### (Unjust Enrichment)

100.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in all preceding paragraphs with the same force and effect as if more fully set forth herein.

101.    Epstein, as a "consultant" to TFC from approximately 1987 through 1993, caused

the transfer of securities, cash and assets from TFC assets or accounts to himself and/or to Defendant Entities.

102.    Further, because of Epstein and/or the Defendant Entities' participation in the TFC Ponzi Scheme, Epstein and/or the Defendant Entities received improper disbursements of funds from TFC as payment for his "services," including broker's fees on investment advice, in the form of monthly checks.

103.    Through these improper transfers, the intentional diversion of cash and assets, and the receipt of payment for "services" which amounted to defrauding hundreds of thousands of investors, Epstein, by and through the Defendant Entities, intentionally interfered with the rights of TFC, Plaintiffs and the Class and deprived them of the use and benefit of the cash and interest earned on the securities.

104.    Epstein, by and through the Defendant Entities, have long benefitted, and continue to benefit, at the expense of the Plaintiffs and the Class, as these funds have been used to create and maintain Epstein's lavish lifestyle.

105.    As a result of these improper acts by Epstein and/or the Defendant Entities, Plaintiffs and the Class have been damaged in an aggregate amount in excess of $500,000,000.

**FOURTH CAUSE OF ACTION**
**(Breach of Fiduciary Duty)**

106.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in all preceding paragraphs with the same force and effect as if more fully set forth herein.

107.    As an associate and consultant to TFC, Epstein was a fiduciary and owed certain duties to TFC, Plaintiffs and the Class, including, but not limited to, the duty to exercise the highest degree of honesty, care, good faith and loyalty in handling the securities of TFC.

108.    Upon information and belief, beginning in or around 1990, continuing through the

present, Epstein, in breach of his fiduciary duties and in violation of New York law, (i) transferred cash, securities and assets from the accounts of TFC for his personal use and/or for Defendant Entities, (ii) made a series of imprudent investments and loans resulting in a loss of considerable sums of money to TFC, Plaintiffs and the Class, and (iii) concealed the true nature of financial transactions of the Defendant Entities from Plaintiffs and the Class.

109.    Presently, Epstein and the Defendant Entities continue to conceal the true nature of financial transactions from banks, financial institutions and current investors of a syndication of margin accounts.

110.    These breaches of fiduciary duty were fraudulent, a conflict of interest with TFC, Plaintiffs and the Class, and constituted waste and mismanagement of the securities and investments of such entities and individuals.

111.    As a direct and proximate result of Epstein's willful, wanton and malicious breaches of fiduciary duties, individually, and by and through the Defendant Entities, TFC, Plaintiffs and the Class were damaged.

**FIFTH CAUSE OF ACTION**
**(Negligence)**

112.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in all preceding paragraphs with the same force and effect as if more fully set forth herein.

113.    As a "consultant" to Hoffenberg and executive and/or investment committees formed to make decisions with respect to the investments of Plaintiffs and the Class, Epstein owed a duty to Plaintiffs and the Class to exercise reasonable business judgment in the handling of the securities and investments.

114.    Beginning in or around 1987 through the present, Epstein, in breach of his duties, negligently invested the funds of TFC in securities that were inappropriate investments and caused

TFC to suffer tremendous financial loss.

115.    Beginning in or around 1987 and through the present, Epstein, in breach of his obligations, negligently transferred securities and cash from assets or accounts in TFC, properly belonging to Plaintiffs and the Class who invested in TFC Bonds and TFC Promissory Notes, into the Defendant Entities.

116.    As a direct and proximate consequence of Epstein's negligence, individually, and by and through the Defendant Entities, Plaintiffs and the Class have been injured.

**SIXTH CAUSE OF ACTION**
**(Fraudulent Concealment)**

117.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in all preceding paragraphs with the same force and effect as if more fully set forth herein.

118.    With the intent to derive the use, enjoyment and profits belonging to TFC, Plaintiffs and the Class, and with the intent to injure such entities and individuals, Epstein actively participated in devising the TFC Ponzi Scheme by participating in acquiring assets and funds though TFC for his own personal gain or use, or the gain or use of the Defendant Entities.

119.    Under the guise of acting for TFC, Plaintiff and the Class, Epstein actively participated in creating and executing several fraudulent Ponzi schemes.

120.    Epstein concealed his actual intentions of converting the assets of TFC, Plaintiffs and the Class to himself or the Defendant Entities for his own personal gain or use.

121.    With the knowledge that the assets of TFC were not being used for the benefit of Plaintiffs and the Class, Epstein transferred the assets to himself and/or to the Defendant Entities for his own personal gain or use.

122.    Through these transfers, Epstein, by and through the Defendant Entities, intentionally converted and disposed of the cash and interest earned on the securities for the benefit

or use of Epstein and/or the Defendant Entities.

123.    TFC, Plaintiffs and the Class reasonably relied upon the Ponzi schemes, which were created and executed by Epstein, and that such schemes were in the best interests of TFC, Plaintiffs and the Class.

124.    Plaintiffs and the Class became aware of the fraud and Ponzi scheme and the subsequent conviction of Hoffenberg and made all reasonable efforts to recover their lost monies, including but not limited to the nearly 100 civil lawsuits filed in this judicial district related to the fraudulent, negligent, and unethical behavior alleged herein.

125.    As a result of their efforts, Plaintiffs and the Class determined that Hoffenberg had co-conspirators.

126.    Despite the due diligence of Plaintiffs and the Class, the Defendants' continued misrepresentations, omissions, and fraudulent activities remained concealed from Plaintiffs and the Class; but for Non-Party Hoffenberg's recent affidavit, Plaintiffs and Class members would not have uncovered Defendants' identities and the nature of the Defendants' action and role in the TFC Ponzi Scheme.

127.    Plaintiffs and each member of the Class have lost money and been damaged as a result of Defendants' unfair, unlawful, and deceptive conduct alleged herein. They are accordingly entitled damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs respectfully request that the Court enter judgment against the Defendants, as follows:

A.  Ordering compensation in an amount to be determined at trial, with additional damages, for all general, special, incidental, and consequential damages suffered by the Plaintiffs and the

Class as a result of the Defendants' fraudulent acts;

B. Ordering compensation in an amount to be determined at trial, with additional damages, for all general, special, incidental, and consequential damages suffered by the Plaintiffs and the Class, as a result of the Defendants' conversion of property belonging to Plaintiffs and the Class;

C. Ordering compensation in an amount to be determined at trial, with additional damages, for all general, special, incidental, and consequential damages suffered by the Plaintiffs and the Class as a result of Defendants' unjust enrichment;

D. Ordering compensation in an amount to be determined at trial, with additional damages, for all general, special, incidental, and consequential damages suffered by the Plaintiffs and the Class, as a result of the Defendants' breaches of fiduciary duties;

E. Ordering compensation in an amount to be determined at trial, with additional damages, for all general, special, incidental, and consequential damages suffered by the Plaintiffs and the Class, as a result of the Defendants' continuous wrongful and negligent acts;

F. Ordering compensation in an amount to be determined at trial, with additional damages, for all general, special, incidental, and consequential damages suffered by the Plaintiffs and the Class, as a result of Defendants' fraudulent concealment of Defendants' unfair, unlawful, and deceptive conduct;

G. Awarding Plaintiffs and the Class their reasonable attorney's fees and costs, to the fullest extent allowed by law; and

H. Granting all such additional or further relief as this Court deems just and equitable under the circumstances.

## JURY DEMAND

The Plaintiffs hereby demand a trial by jury.


Dated: August 20, 2018

        Respectfully submitted,

        **HACH ROSE SCHIRRIPA & CHEVERIE LLP**

        By:*/s/ Frank R. Schirripa*
        Frank R. Schirripa
        Daniel B. Rehns
        Hillary M. Nappi
        112 Madison Avenue, 10th Floor
        New York, New York 10016
        Telephone: (212) 213-8311
        Facsimile: (212) 779-0028
        Email: *fschirripa@hrsclaw.com*
               *drehns@hrsclaw.com*
               *hnappi@hrsclaw.com*

        *Attorneys for Plaintiffs and the Proposed Class*


**Of Counsel:**

Gary H. Baise, Esq. (DC Bar #194878)
600 New Hampshire Avenue, N.W. Suite 500
Washington, D.C. 20037
Telephone: (202) 518-6345
Email: *gbaise@ofwlaw.com*

*Additional Counsel for Plaintiffs*