# Exhibit A

STATES DISTRICT COURT
RN DISTRICT OF NEW YORK

STATES OF AMERICA,

- against -

STEVEN HOFFENBERG

    Defendant.

SENTENCING OPINION

94 Cr. 213 (RWS)
95 Cr. 321 (RWS)

Sweet, D. J.

     Defendant Steven Hoffenberg ("Hoffenberg") pled guilty on April 20, 1995, to five counts: (i) conspiracy to violate the securities laws by fraudulently selling securities, in violation of 18 U.S.C. § 371; (ii) mail fraud, in violation of 18 U.S.C. §§ 1341, 1342; (iii) conspiracy to obstruct justice, in violation of 18 U.S.C. § 371; (iv) tax evasion, in violation of 26 U.S.C. § 7201; and (v) mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1342, exposing him to a total maximum sentence under the applicable statutes of 25 years imprisonment followed by three years of supervised release.

     For the reasons set forth below, Hoffenberg will be sentenced to serve a term of imprisonment of 240 months, followed by three years supervised release, to make restitution in the amount of $475,157,340, and to pay a fine of $1,000,000, all subject to the hearing now set for March 7, 1997. Pursuant to 18

1

3/4/97

U.S.C. § 3013, a special assessment of $250.00, $50.00 per count, is mandatory.

## The Offense Conduct

Until April 1993, Hoffenberg was the chief executive officer, president and chairman of the board of Towers Financial Corporation ("Towers"). In 1987, Towers acquired a controlling interest in United Diversified Corporation ("UDC"), which conducted business through its subsidiaries, Associated Life Insurance Co. ("Associated") and United Fire Insurance Co. ("United Fire"). Hoffenberg later became chairman of the boards of UDC, Associated and United Fire.

Hoffenberg obtained the Illinois Department of Insurance's approval for this acquisition by representing that Towers would contribute $3 million to the surplus of United Fire, supplying $2 million immediately and an additional $1 million at a later date. In approximately November 1987, Hoffenberg and his co-conspirators [handwritten: (Jeffrey Epstein)] used certain of the Associated and United Fire bonds as collateral in securities brokerage accounts in order to purchase stock of Pan American Airways, Inc. ("Pan Am"). When this attempted acquisition failed, United Fire and Associated suffered trading losses of over $80,000.

2

Between November 1987 and July 1988, Hoffenberg also removed blank checks belonging to UDC and United Fire from the offices of both companies, and then issued over fifty checks on these accounts. Many of those checks were issued for his own benefit or for expenditures, totalling over $3 million, unrelated to the insurance companies, including tuition costs and credit card bills for Hoffenberg's stepdaughter; the payment of investment consultant fees for Towers; the purchase of Emery Air Freight stock; the payment of margin interest; the payment of private airplane leasing expenses; legal and consulting expenses; and payments to Towers and one of its affiliated companies, totalling $1.1 million.

Between December 1987 and June 1988, Hoffenberg and his co-conspirators again used Associated and United Fire bonds as collateral in securities brokerage accounts to purchase and sell stock and options of companies, including Emery Air Freight. In this instance, as well as with the previous attempted Pan Am acquisition, Hoffenberg did not intend for these purchases of stock to be solely for the benefit of the insurance companies, but rather intended them to benefit Towers.

On January 24, 1988, Towers contributed $1.8 million in capital to United Fire, $1 million of which was intended to fulfill Towers' agreement with state insurance regulators to make a $3 million capital contribution by December 31, 1987. However, prior

to this contribution, Hoffenberg used the $1.8 million to pay for stock in Emery Air Freight in an attempt to acquire that company.

The attempted acquisition of Emery Air Freight ultimately failed. United Fire and Associated lost over $1 million on the purchase of Emery securities, as those stocks were purchased with funds borrowed by using insurance company bonds as collateral. Hoffenberg concealed his activities from Associated and United Fire by: routing all securities trade confirmations, periodic account statements and other communications from brokerage firms to Towers, rather than to the insurance companies' headquarters; causing false entries to be made on the records of the insurance companies; failing to provide supporting documentation for certain expenditures; providing false information or withholding accurate information in annual and quarterly reports regarding the location and use of bonds, capital contributions made to the insurance companies, securities trading done with insurance company assets, and the financial condition of United Fire and Associated. Hoffenberg and his co-conspirators [Jeffrey Epstein] also created false documents and filed false pleadings in related legal proceedings brought by state insurance regulators; closed out securities positions without regard to the profitability of the transactions; committed and suborned perjury; and concealed their fraudulent activities in connection with state insurance regulators' investigations.

4

Finally, in a further attempt to conceal their activities, Hoffenberg and his co-conspirators filed a lawsuit in the United States District Court for the Northern District of Illinois against individual State of Illinois insurance regulation employees, alleging that these employees instituted "sham conservation proceedings" against the insurance companies and that their actions were motivated by a "personal animus."

As a result of Hoffenberg's fraudulent activity, over $3 million of the funds and assets of United Fire and Associated were misappropriated through trading losses, margin interest expenses and Hoffenberg's unauthorized use of insurance company funds for personal expenditures. These misappropriations significantly reduced the capital available to operate the insurance companies, adversely affecting policyholders and shareholders of UDC.

In July 1988, the Illinois Director of Insurance obtained an order placing UDC, Associated and United Fire in conservation. On February 14, 1989, Hoffenberg agreed, in a signed stipulation, to an entry of an order liquidating Associated and United Fire, based on Hoffenberg's agreement that both companies were insolvent. Hoffenberg lost control of these companies on March 3, 1989, when the liquidation order was entered.

On June 27, 1991, three days before the end of Towers' 1991 fiscal year, the Illinois Insurance Director filed an action

5

charging Hoffenberg and others with using the insurance companies as an instrumentality of Towers, and with transferring investments and cash belonging to the insurance companies into various Hoffenberg-controlled brokerage accounts, in violation of the Racketeer Influenced and Corrupt Organizations Act (the "RICO Action"). The RICO Action alleged that the defendants had caused UDC, Associated Life and United Fire to suffer damages in excess of $4 million, become insolvent, and be placed in conservation and/or liquidation.

In an agreement dated May 4, 1992, the Insurance Director and the defendants agreed to settle the RICO Action, with Towers paying $3.5 million. Towers also agreed to sell its interest in Towers Diversified to the Insurance Director for $1, and to withdraw objections to the liquidation of Towers Diversified. According to the SEC, Towers never disclosed the liquidation of these companies or the filing of this civil suit to its investors, and continued to carry the investment at its full cost. Towers further misrepresented this information in its Annual Reports of 1989 and 1990. In the Towers Annual report of 1989, a note to the financial statements (completed after the agreement by Hoffenberg that the companies were insolvent and could be liquidated) suggested that Towers had never completed its agreement to purchase the companies and that the conclusion of the matter was "being held in abeyance pending the finalization of certain regulatory

6

matters." The 1989 report also falsely stated that there was no "other material litigation in which the Company [was] involved."

The 1990 Towers Annual Report disclosed the litigation between Towers and the previous UDC owners, but made no mention of the "regulatory matters" referred to in the 1989 report. Upon issuance of the 1991 Towers Annual Report, the company admitted that Towers had purchased UDC in 1987 and that the company was placed in "receivership within six months of the acquisition"; however the note also stated that the Insurance Director had "instituted a legal action to take possession of all assets of UDC." The financial statement continued, stating that it was management's belief that the Illinois Insurance Director would not prevail and "that the Company will ultimately be determined to be entitled to all assets of UDC, in which case the Company would experience no loss on this investment." At the time that this statement was made, the Insurance Director had already prevailed in the liquidation order, and Towers had already suffered a total loss on its investment.

Hoffenberg, through Towers, was also engaged in illegal conduct in the New York area. Towers had two subsidiaries: Towers Credit Corporation, which was engaged in "factoring," the purchase at a discount of commercial accounts receivable, and Towers Collection Services, Inc., which was engaged in the collection of past-due receivables for third parties on a contingency-fee basis.

7

Towers also owned and controlled Towers Healthcare Receivables Funding Corporations I, II, III, IV and V (the "THRFC Bond Funds"), which were formed to raise funds for the purchase of accounts receivable, and which purchased accounts receivable due to hospitals from Towers pursuant to an agreement with the bondholders' indentured trustee. Hoffenberg controlled Towers' daily operations, including the flow of funds among checking accounts and the escrow accounts established for the proceeds of the promissory notes.

In the mid-1980's, Hoffenberg decided to expand Towers. In order to raise capital, he and his co-conspirators devised a plan to sell Promissory Notes (the "Notes"). Towers sold the Notes in private placements by means of six separate offering memoranda prepared at Hoffenberg's direction. Each issuance of the Notes was purportedly collaterized by accounts receivable owned by Towers' subsidiaries, and was additionally guaranteed by Towers to the extent of its consolidated assets. The six offering memoranda, dated from January 1988 through March 1992, resulted in the sale of approximately $272 million in Notes through a network of registered broker-dealers throughout the United States.

Hoffenberg and his co-conspirators fraudulently induced the purchase of the Notes by preparing and providing to investors financial statements which used bogus income and asset figures to falsely conceal Towers' true financial condition. The bogus

8

figures were created after it was determined that the company's net cash position was negative, and that a certain profit must be shown in order to sell the Notes. In addition to creating fraudulent financial statements, Hoffenberg and his co-conspirators arranged to have a certified public accountant falsely certify that the financial statements accurately reflected Towers' financial condition.

Only a small fraction of the proceeds from the sale of the Notes were used for the expansion of Towers' business, the purpose stated in the offering documents. The proceeds were used instead to pay Towers' operating expenses, including a private jet and a yacht used by Hoffenberg, and to pay interest on the Notes themselves.

The Notes were not properly collaterized. Hoffenberg and his co-conspirators represented to investors that the face value of the collateral exceeded the face value of the Notes. In fact, the collateral was comprised in significant part of phony receivables, which were not worth the total outstanding debt of the investors. In addition, the accounts receivable reflected in the financial statements consisted mainly of collection receivables which Towers did not own, but only collected as agent and took a fee, and of certain healthcare receivables purchased by the THRFC Bond Funds. Receivables not actually owned by Towers could not properly collateralize the Notes.

9

54

In about July 1990, Hoffenberg and his co-conspirators made additional efforts to raise capital and expand Towers by engaging in the sale of a series of Bonds. To this end, Hoffenberg and his co-conspirators created the THRFC Bond Funds, a series of corporations which issued Bonds to purchase accounts receivable due to healthcare institutions from Towers in accordance with a series of Indenture Agreements.

The Bonds were sold pursuant to five separate, private placement memoranda prepared at the direction of Hoffenberg and his co-conspirators. The private placement memoranda for each issuance of the Bonds represented that the proceeds from the sales of the Bonds would be used by the THRFC Bond Funds, in whole or in part, to purchase healthcare receivables from Towers, and that the healthcare receivables purchased from Towers would collateralize the Bonds. According to the offering documents, the obligors on the healthcare receivables would be major insurance companies such as Blue Cross/Blue Shield, State Farm Insurance Company, Aetna Insurance Company, Allstate Insurance Company, or government entities. The documents provided that more than 50% of the healthcare receivables must represent the payment obligations of insurers having a rating of "A" or better and Government entities under Medicaid or Medicare programs who had agreed in writing to send all payments directly to the servicer. No more than 50% of the healthcare receivables could represent the obligations of government entities which had not so agreed.

10

Between July 1990 and May 1992, Towers sold approximately $210 million in bonds through the five THRFC funds. The offering documents touted not only the quality of the healthcare receivables, but also the financial soundness of Towers; the Bond sales were promoted by the figures in the fraudulent Towers financial statements. The offering documents described Towers and its subsidiaries as having engaged in either servicing or acquiring accounts receivable having an aggregate value in excess of $630,000,000 -- a vastly inflated number. The gross revenue figures in the offering documents were based on the bogus figures created by Hoffenberg and his co-conspirators and certified by the certified public accountant. Accordingly, the Bond sales, like the Note sales, were promoted by fraud.

Hoffenberg and his co-conspirators also deliberately misrepresented how investor funds would be used, and misused the proceeds from the sale of the Bonds. The strictures in the offering documents and the Indenture Agreements were ignored, and Hoffenberg and his co-conspirators used substantial amounts of the proceeds from the sales to meet Towers's operating expenses. Towers provided two kinds of reports to the Trustee on a regular basis: a cash request report and a collateral ratio report. Both were used to fraudulently obtain money from the Trustee.

When Towers acquired healthcare receivables, it provided to the Trustee a total figure for the receivables it planned to

11

acquire, and the Trustee then released 50% of the value of the receivables to Towers to make the first payment on the receivables. As Hoffenberg needed more money to operate Towers, he directed his co-conspirators to provide inflated figures for receivables to accommodate Towers's cash needs. In this way, the Trustee released 50% of the value of bogus receivables, and Hoffenberg had cash with which to meet his operating expenses.

Towers was also required to send collateral ratio reports to the Trustee. These reports were designed to ensure that each of the Bond Funds were properly collateralized by accounts receivable. Since Hoffenberg was using monies from the Bond Funds to pay his operating expenses, the Bond Funds did not have sufficient collateral to support payments to Towers. To cover up the fraud, Hoffenberg directed his co-conspirators to move collateral from one Bond Fund to another, and to fabricate collateral for the reports. On numerous occasions, Hoffenberg and his co-conspirators created phony receivables, then included those items in reports designed to misrepresent the Bond Funds' true financial picture.

One condition to the issuance of the Bonds was that Duff & Phelps Credit Rating Company rate the Bonds as AA or better. Because Hoffenberg and his co-conspirators were acquiring healthcare receivables that were not from A rated insurers, and this might have affected Duff & Phelps's rating of the Bonds, Hoffenberg directed his employees to alter the reports sent to Duff

& Phelps by combining healthcare receivables from small insurers and adding those numbers to the amounts of receivables acquired from A rated insurers.

The Indenture Agreement also prohibited Towers from holding any healthcare accounts receivable on its books for more than 90 days. After 90 days, it is less likely that a receivable will be collected. To secretly enable Towers to keep old accounts on their books, Hoffenberg directed employees to "freshen" accounts -- if an account was more than 90 days old, it was deleted and re-entered as a "new" account.

In or about 1989, the Securities & Exchange Commission ("SEC") began an investigation of the fraudulent sale of Towers' securities by Hoffenberg and his co-conspirators. In the course of this investigation, which ultimately resulted in a lawsuit against Towers, the SEC deposed Hoffenberg and numerous officers, employees and agents of Towers. The SEC also issued numerous subpoenas and requests for documents to Towers, Hoffenberg and his co-conspirators. Hoffenberg and his co-conspirators had agreed from the outset of the SEC's investigation to take whatever steps they deemed necessary to obstruct that investigation and conceal their criminal activities.

As part of his attempt to obstruct the SEC investigation, Hoffenberg gave false testimony to the SEC in New York City on



several occasions between November 21 and December 12, 1991. In 1992, Hoffenberg directed Towers employees and associates to testify falsely during the SEC investigation. Hoffenberg and his co-conspirators have also admitted to fabricating and falsifying documents in response to the SEC subpoenas. For example, in response to the SEC request for accounting records supporting Towers' financial statements, in or about May 1992, Hoffenberg and his co-conspirators instructed employees to fabricate computer runs of certain accounts receivable to reflect a 30% collection rate and to substantiate Towers's bogus accounting theories used in compiling its financial statements for 1989, 1990, and 1991. After these false computer runs were created, Hoffenberg directed two employees to make tick marks on the runs so that it appeared as if an accountant had used the runs in certifying the financial statements for the appropriate years. Towers then provided the runs to the SEC.

Between 1987 and 1991, Hoffenberg evaded personal income taxes by causing his personal expenses to be paid by Professional Business Brokers, a corporation Hoffenberg owned. Some of the personal items that Professional Business Brokers paid included: Hoffenberg's rent and his stepdaughter's rent, salaries for personal servants, furniture and antiques for his residence, personal automobiles and maintenance, and maintenance for his personal residences. The additional tax due and owing for each

year is as follows:   1987: $7,230;  1988: $31,068;  1989: $43,606; 1990: $199,674;   1991: $386,702.

In March 1993, after the SEC had filed a lawsuit against Towers, Towers declared bankruptcy. The loss to the Noteholders and Bondholders, the victims of Hoffenberg's fraud, was enormous. At the time of the Towers bankruptcy, Noteholders and Bondholders (as well as victims such as vendors and collections clients) filed petitions with the Bankruptcy Court to support their loss claims. As of April 1996, the Bankruptcy Court has already determined the following Noteholder and Bondholder claims to be valid claims: the Bondholders filed valid claims of $196,948,864; the Noteholders filed valid claims of $258,244,618; and a second class of Noteholders' filed valid claims of $19,963,858. The total of those claims equals a loss of $475,157,340. This figure represents the approximate losses resulting from the Towers fraud only and does not include losses resulting from the Illinois insurance company fraud, which totalled between $3 million and $4 million. The total losses attributable to Hoffenberg's conduct are $478,157,340.

15