Exhibit B

## AFFIDAVIT OF STEVEN J. HOFFENBERG

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | ) ss.: |
| COUNTY OF NEW YORK | ) |

STEVEN J. HOFFENBERG, being duly sworn, deposes, and says that:

1.     I am a not a party in the above captioned case.

2.     I served as Chief Executive Officer of Towers Financial Corporation ("TFC") from 1975 through April 1993.

3.     TFC was a corporation which provided financial services and assistance to its clients and was in the business of purchasing large volumes of outstanding receivables, and then collecting on them.

4.     TFC owned and operated subsidiaries including Towers Credit Corporation, Towers Collection Services Inc., and Towers HealthCare Receivables Funding Corporations I, II, III, IV, and V.

5.     In or around the mid-1980s, I was introduced to Jeffrey E. Epstein ("Epstein"). At the time we met, Epstein was running his own consulting company, International Assets Group Inc. out of his New York City apartment.

6.     In or around 1987, I hired Epstein as an associate and expert to consult with TFC and me. Epstein was responsible for assisting me full-time in all matters of business operations and management of TFC, as well as raising capital for TFC from investors.

7.     Through TFC, Epstein orchestrated and planned an intricate fraud which depended on maintaining capital inflow to cover off losses incurred by existing investors.

8.     For example, in 1987, TFC acquired a controlling interest in United Diversified Corporation ("UDC"), which conducted business through two Illinois insurance company

subsidiaries, Associated Life Insurance Co. ("Associated") and United Fired Insurance Co. ("United Fire").

9.      In order to complete the acquisition, Illinois state regulators required their approval. Epstein was the architect of the plan to secure the approval from the regulators. In fact, the approval was obtained because Epstein represented to regulators that TFC would contribute three million dollars ($3,000,000) to the surplus of United Fire.

10.     After the insurance companies were acquired, in or around November 1987, Epstein and I used the insurance companies' bonds as collateral in securities brokerage accounts. Epstein controlled these brokerage accounts and the accounts were used in a failed take-over attempt of Pan American Airways, Inc.

11.     When the take-over attempt failed, the insurance companies suffered overwhelming trading losses, resulting in attendant losses for investors in TFC.

12.     In an attempt to hide these losses, Epstein and I diverted investor funds and used the money for our own personal needs. I believe Epstein used the funds as investment capital for corporations he controlled, including The Financial Trust Company.

13.     Between November 1987 and July 1988, I issued a number of checks from UDC and United Fire's accounts on behalf of TFC. These checks were used to pay for a series of improper expenditures including the payment of Epstein's "consultant fee."

14.     From December 1987 and June 1998, Epstein and I again used the insurance companies' bonds as collateral in securities brokerage accounts, controlled by Epstein, to purchase and sell stock and options in a number of high risk investments.

15.     In particular, one of these high risk investments was TFC's attempted take-over of in Emery Air Freight ("Emery"). This investment was an epic failure resulting in massive trading losses to TFC.

16.     In the wake of these losses, Epstein manipulated the price of Emery stock to minimize the losses when the share price began to fall. Specifically, Epstein opened and maintained a number of brokerage accounts to execute false trades in order to artificially inflate the price of Emery stock – while the company was actually useless.

17.     Epstein did not have a license to trade, but he was determined to trade, purchase and sell stocks, bonds and other securities. Epstein accomplished his goal by what he referred to as "making the orders." Epstein "made the orders" by utilizing licensed brokers to trade, purchase and sell stock.  He traded these stocks based on his insider knowledge and, as a result, earned sizable profits.

18.     Epstein used the monies he misappropriated and earned from his illegal trading activities and used them as start-up capital for his corporations, including The Financial Trust Company.

19.     Epstein conceived many ways we could cover up our dubious activities. Some of the actions we took included routing all securities trades confirmations from brokerage firms to TFC, rather than to the insurance companies' offices; causing false entries to be made on the records of the insurance companies; failing to provide supporting documentation for expenditures; providing false information or withholding accurate information in annual and quarterly reports regarding the location and use of bonds; making capital contributions to the insurance companies; creating false documents; and, closing out securities positions without regard to the profitability of the transactions.

3

20.     In or around the late 1980s, TFC became insolvent because of the massive losses incurred over the years. Epstein devised yet another scheme to raise capital for TFC by selling Promissory Notes.

21.     From January 1988 through March 1992, by means of six (6) separate private placement offering memoranda (the "TFC Promissory Notes"), Epstein and TFC represented to potential investors that the TFC Promissory Notes were collateralized by accounts receivable owned by TFC. This was not true.

22.     Epstein represented to investors that the face value of the collateral exceeded the face value of the TFC Promissory Notes. The collateral on the fabricated receivables did not exist.

23.     Epstein assisted in preparing and drafting the private placement offering memoranda which included financial statements filled with falsified income and asset figures intended to conceal TFC's true financial condition.

24.     To give more credibility to the offerings, Epstein arranged a certified public accountant to falsely certify the financial statements. It was imperative that potential investors believed that TFC was profitable. Without this belief, investors would never have faith they would earn future profits from the TFC Promissory Notes.

25.     Approximately two hundred seventy two million dollars ($272,000,000) in TFC Promissory Notes were sold throughout the United States. The proceeds of the sales were used to pay TFC's operating expenses, including private planes and other personal expenses of Epstein and me, and to pay interest on the TFC Promissory Notes which were not properly collateralized.

4

26.    In July 1990, Epstein made additional efforts to raise more capital and expand TFC by offering and selling additional debt instruments in the form of bonds to investors ("TFC Bonds").

27.    Epstein created or caused to have created TFC subsidiaries -- the THFRC Bond Funds -- which were a series of corporate entities that issued the TFC Bonds.

28.    The TFC Bonds were sold pursuant to five (5) separate private placement memoranda. The memoranda indicated that the proceeds from the sales of the TFC Bonds would be used by the THRFC Bond Funds, in whole or in part, to purchase healthcare receivables from TFC and that the healthcare receivables purchased from TFC would collateralize the TFC Bonds.

29.    Epstein deliberately misrepresented how the proceeds of the sale of the TFC Bonds would be used.

30.    In preparation for acquiring healthcare receivables, TFC would provide a total figure for the amount of receivables it planned to acquire; in response, a percentage of the value of the receivables was released to TFC in cash.

31.    When more money was needed to operate TFC, Epstein would provide inflated figures for the receivables to accommodate TFC's cash needs.

32.    Epstein developed creative ways to hide this scheme. Epstein directed collateral to be moved from one THRFC Bond Fund to another; he falsified collateral records in the periodic reports to investors and in SEC filings; and he created phony receivables and then included those receivables in reports designed to misrepresent the true financial picture of the THRFC Bond Funds.

5

33.    Between July 1990 and May 1992, TFC sold approximately two hundred ten million ($210,000,000) dollars in TFC Bonds.

34.    In February 1993, following a lengthy investigation, the SEC filed suit against me, TFC, and other TFC officials for securities fraud.

35.    In or around March 1993, TFC filed for Chapter 11 bankruptcy protection, and the TFC's Noteholders and Bondholders filed claims with the Bankruptcy Court to support their loss claims.

36.    On April 19, 1994, and as a result of the SEC investigation, I was indicted in the Northern District of Illinois on various fraud charges.

37.    The next day, on April 20, 1994, I was indicted in the Southern District of New York on numerous charges resulting from the SEC investigation and lawsuit, including mail fraud, securities fraud in connection with the sale of the TFC Promissory Notes and TFC Bonds, unlawful conspiracy and obstruction of justice.

38.    Epstein was never charged with any crime for his involvement in the fraudulent schemes described herein.

39.    During the course of my criminal trial, Prosecutors offered me a reduced sentence in exchange for information about Epstein's role.  However, I did not disclose any details about Epstein's involvement, let alone orchestration, of the fraudulent scheme.

40.    On April 20, 1995, I pled guilty to conspiracy to violate the securities laws by fraudulently selling securities, in violation of 18 U.S.C. §371; mail fraud, in violation of 18 U.S.C. §1341; conspiracy to obstruct justice, in violation of 18 U.S.C. §371; and tax evasion, in violation of 26 U.S.C. §7201.

41.     On March 7, 1997, I was sentenced to twenty years in prison, a term of supervised release, as well as a one million dollar ($1,000,000) fine, approximately four hundred seventy-five million dollars ($475,000,000) in restitution, and court surcharges.

42.     To be abundantly clear, I was the sole Defendant in the criminal case.  However, it was known to the investigators, prosecutors, and established as fact by the Court, that there were co-conspirators who participated in my crimes. My co-conspirators were never charged for their role in my crimes. I, however, was sentenced to prison and served my time.

43.     Epstein and the corporations he formed were my co-conspirators. Epstein has remained free and has used and benefitted from the ill-gotten gains he amassed as a result of his criminal and fraudulent activities.

44.     In May 2016, in an attempt to reveal Epstein's involvement in the Ponzi scheme, my attorneys filed a civil lawsuit on my behalf. The lawsuit was brought against Epstein and his corporations, seeking relief on behalf of myself and as a constructive trustee of the TFC Noteholders and Bondholders.

45.     That lawsuit was eventually withdrawn with prejudice and the full extent of Epstein's involvement in my crimes and the related frauds was never exposed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Steven J. Hoffenberg

Sworn to before me this
17ᵗʰ day of _August_, 2018

Notary Public
My commission expires: 3/31/2019
Reg. # 02SC6090024                                          7